### No. 12,151.

LOUISIANA CONSTRUCTION AND IMPROVEMENT COMPANY ET ALS. VS. THE ILLINOIS CENTRAL RAILROAD COMPANY ET ALS.

The Common Council of the city of New Orleans, possessing under its charter and other statutes of the State only power of administration, has no authority to enact and promulgate an ordinance authorizing a railroad corporation to erect buildings and other permanent structures upon the batture in front of its riparian property on the bank of the Mississippi river, within the limits of the city, connect same with wharves on the edge of the water and consecrate same to its exclusive use and enjoyment for a period of ninety-nine years.

Such an ordinance confers a grant that is in the nature of a perpetuity, and not a license revocable at the will of the municipality.

*Miller, J., concurring:* Our courts have recognized the right of action of the citizens in controversies of this nature. Whenever batture is withdrawn, enough mus be left for public use. This ordinance takes all, and practically for all time.

Whether accretion in the future expands this batture, or the encroachment of the river diminishes the area, the ninety-nine years' ordinance is to stand an impediment, I think, to that control of public places, apt to become requisite, conferred on the Council for the public good, and with which I think the city can not part.

*Breaux, J., dissenting:* Under its delegated and implied powers the city has the right to pass an ordinance "to extend the commerce of the port, and to facilitate the export and import business" of corporations in the service of the public. The license being legal and authorized is not made necessarily void as between plaintiffs and defendants by the period of ninety-nine years for which it was granted.

The defendant common carriers are legally authorized to maintain a free wharf for vessels connected with their business, upon condition that improvements were to be made in the interest of commerce and industry. The use is public, and there was no invasion of the legal or equitable right of any one.

APPEAL from the Civil District Court for the Parish of Orleans. *Rightor, J.*

*J. R. Beckwith* for Plaintiffs, Appellants.

*S. L. Gilmore*, City Attorney, for City of New Orleans, Appellee.

*Thomas J. Semmes* and *Farrar, Leake & Lemle* for Defendants, Appellees:

ON APPLICATION FOR A REHEARING.

Plaintiffs, a citizens and taxpayers, are utterly without interest in the subject matter of this suit; there being no showing in the petition that the ordinance complained of increases, directly or indirectly, the burden of taxation. Code of Practice, Art. 15; Handy vs. New Orleans, 39 An. 107; Conery vs. Waterworks, 41 An. 921; Dillon on Municipal Corporations, Secs. 920, 922, and authorities there cited; Beach on Public Corporations, Sec. 631, and authorities there cited.

By the Civil Code the "use of the banks of navigable streams is public, etc. Nevertheless the ownership of the river banks belongs to those who possess the adjacent lands." C. C., Art. 455. The highest authorities in the greatest cases that ever arose on this question have settled this for all time. Municipality No. 2 vs. Orleans Cotton Press, 18 La. 122; New Orleans vs. United States, 10 Pet. 662.

FORTY-NINTH ANNUAL REPORTS, 1897. 529

Construction and Improvement Co. et als. vs. Railroad Co. et als.

The general public servitude in this article described does not, how-ever, exist for all purposes, but only for such as are incident to the nature and navigable character of the stream. Lyons vs. Hinckley, 12 An. 657; Railroad Co. vs. Winthrop, 5 An. 36; Duvergé vs. Salter, 6 An. 450.

A reading of Partidas, Title XXVII, laws 6, 7 and 8, will show that the above *dictum* as to the nature and character of the general public servitude in the banks of rivers is literally correct, even under the old Spanish laws. Moreau & Carleton's Partidas, Vol. 1. pp. 337, 338.

The legal presumption from the character of the structures authorized by the ordinance at bar, "wharves, docks, piers, elevators, warehouses," etc., must be that such structures will be facilities to commerce and navigation. Stevens vs. Walker, 15 An. 578; Atlee vs. Packet Co., 21 Wall. 393; Geiger vs. Filor, 8 Fla. 323.

As "individuals of full age, residing in the place," plaintiffs are equally without rights of action, under Art. 861 of the Civil Code of 1870, to prevent the construction, by riparian proprietors, of buildings and other works of public utility, for the mooring of vessels and discharge of their cargoes," as authorized by the ordinance complained of, since the city of New Orleans has express delegated power to authorize such structures. Civil Code, Art. 863.

This power she has exercised in the fullest terms, over and over again for years.

The Code of Louisiana, of 1808, does not contain Art. 863 or any part of Title VI. This is an innovation. See Amendments to the Civil Code.

The entire legislation of the State and the jurisprudence from the earliest times recognize the authority of the city of New Orleans to control and administer in the interest of commerce the public servitude along the banks of the Mississippi river within her limits, and there is no case in Louisiana jurisprudence denying the right of any municipal corporation to license the building of wharves and other works of public utility by riparian pro-prietors, when contested by one or more individual inhabitants.

In instances where the city of New Orleans appears to have delayed or refused to grant interstate railway companies the right to connect carrying facilities by land with shipping, the sovereign

34

power in furtherance of its general policy of encouraging railroad enterprises has stepped in and acted directly.    27 An. 414; Act 78 of 1870.

The Dock Commission Act contains an express legislative recognition of the right of riparian proprietors to maintain, for their exclusive use, wharves established prior to the passage of the act, under whatever authority constructed.    Act No. 70 of 1896, Sec. 2, page 103.

The ordinance complained of is not an alienation nor a sale or lease of city property, which the city is restricted, in the mode of dealing with, by the terms of her charter, limiting a lease to ten years and requiring public competition.    City Charter of 1882, Sec. 8; Act 135 of 1888; Construction Co. vs. City, 140 U. S.

The term ninety-nine years can have no determining effect on the validity of the ordinance.    If no terms had been expressed in the ordinance it would have been perpetual or during the " term of the charter " of the licensee.    Telephone Company vs. City, 40 An. 41; East Louisiana Railroad Company vs. City, 46 An.; Flynn's Digest of City Ordinances, p. 1208; Wharf Ordinance of Texas & Pacific Railway Company.

Whatever be the limit of time or term, if any, for which the city could authorize such structures, as provided in this ordinance, whether for ten or twenty-five years or more, no right of action could arise in respect to the ordinance upon that ground, until the legal period had expired.

Articles 46 and 56 of the Constitution manifestly have no application to this case.

———

Argued and submitted December 19, 1896.

Opinion handed down February 15, 1897.

Rehearing refused (reasons assigned) April 12, 1897.

———

The opinion of the court was delivered by

WATKINS, J.    The plaintiffs allege that the Louisiana Construction and Improvement Company is the present lessee of a very large portion of the wharves on the banks of the Mississippi river in front of the city of New Orleans, for a term of years, with several years thereof yet to run.

That said lease was farmed out to said corporation at public auction; and that it acquired same for a large and valuable consideration, paid and to be paid to the city, over other bidders therefor.

That said corporation as lessee, as well as other taxpaying inhabitants of the city whom they personate, have an interest in asserting in a court of justice the patent illegality of a city ordinance, the enactment of which was an attempted exercise of a power which had not been granted to the municipality by the Legislature, and was *ultra vires* and void.

The petitioners then represent that the council of the city of New Orleans purported and attempted to enact Ordinance No. 11,765, Council Series, on the 15th of January, 1896, the purport and effect of which was to confer upon the defendants authority to erect upon the batture in front of their riparian property such permanent structures as warehouses, sheds, elevators, buildings, railroad tracks, switches, turnouts, sidings, etc., same to be of such character and capacity " *as the necessities* of (their) business may require;" and further authority to use and operate and maintain the same.

And the further effect and purport of said ordinance appears to be that, at the same time, the defendants may permit all vessels or other water crafts landing, with their permission, at the wharves which they may construct on the water's edge, or doing business with them, to receive and discharge all of their cargoes free of any wharf dues or charges of any kind whatever during the continuance of the term of their grant—said grant being of the duration of ninety-nine years, and having been conferred without public advertisement and adjudication, and without the payment of *any* price, present or prospective.

Upon this hypothesis the plaintiffs claim that the said ordinance is, in legal effect, a *grant in perpetuity of all the rights and uses of the batture and wharves* of a large segment of the Mississippi river, in front of the city, gratuitously, and that the effect of same upon the riparian property of the corporation would be to consecrate it in fee simple to the uses and purposes of the corporation irrevocably.   In other words, that the City Council of New Orleans, possessing only the power of *administration* of the wharves and batture, has undertaken, by said ordinance, to confer upon the defendants the perpetual and exclusive use and enjoyment of a portion of them gratuitously; and that the ordinance is *ultra vires*, and, therefore, void.

And, further, that the city is incapacitated to convey in this manner, or to surrender its police power to either corporation or individual, public or private.

The full text of the ordinance is as follows, viz. :

MAYORALTY OF NEW ORLEANS, ⎱
CITY HALL, January 15, 1896. ⎰

(No. 11,765, Council Series.)

"1. *Be it ordained by the Common Council of the City of New Orleans*, That in order to extend the commerce of the port and to facilitate the export and import business of the Illinois Central Railroad Company and the Yazoo & Mississippi Valley Railroad Company, permission and authority be and are hereby granted to the said companies, their successors and assigns, to *occupy for their uses and purposes* for the period of ninety-nine years from the date hereof, all that *part of the batture* lying between Toledano and General Taylor streets fronting the property owned by either of said companies in the Sixth Municipal District of the city of New Orleans.

"2. *Be it further ordained, etc.*, That the said Illinois Central Railroad Company and the Yazoo & Mississippi Valley Railroad Company, their successors and assigns, be and they are hereby authorized to construct, maintain and operate thereon such wharves, docks, piers, bulkheads, elevators, *warehouses, sheds, buildings and appurtenances as the necessities of their business may require;* all such wharves to be lighted, maintained and kept in repair by the said companies at their own expense.

"3. *Be it further ordained, etc.*, That the said railroad companies in the construction of such wharves shall be required to conform, as nearly as may be, to the standard of the specifications of the existing wharves for steamships between Thalia and Calliope streets.

"4. *Be it further ordained, etc.*, That all steamships, vessels and other water craft receiving or discharging cargo at said *wharves for either of the said railroad companies*, or any steamships, vessels or other water craft *using said wharves by and with the consent of said railroad companies, shall be exempt from payment of all wharf dues;* but this shall *not exempt steamships*, vessels or other water craft from wharf dues for receiving or discharging cargo at or occupying any other wharf.

" 5. *Be it further ordained, etc.*, That said railroad companies shall have the right to construct, maintain and operate, with steam locomotives, or other appropriate motive power, upon and along said wharves, and upon the property owned by said companies, between Tchoupitoulas street and the Mississippi river, from Toledano street to General Taylor street, with the right to cross all intervening streets, all such tracks, switches and turnouts as may be necessary to carry on the business of said companies, with the right to connect said tracks, switches and turnouts with existing tracks of the New Orleans Pacific Railroad Company on Water street, and with the wharves, docks, elevators and buildings that said companies may construct upon said batture and property owned as aforesaid; and said companies shall have the further right to construct, maintain and operate a single track from Toledano and Water street along Water street to General Taylor street, with such switches, sidings and turnouts as may be necessary to connect said single tracks with said existing track and with the wharves, elevators and buildings aforesaid; all such tracks, switches, sidings and turnouts to be constructed on lines and levels to be approved by the City Engineer.

" 6. *Be it further ordained, etc.*, That all the acts and doings of the said companies, under this ordinance, shall be subject to any ordinance or ordinances which may be hereafter passed by the City Council concerning the same.

" 7. *Be it further ordained, etc.*, That this ordinance shall take effect from and after its passage.

" 8. *Be it further ordained, etc.*, That work shall be commenced within ninety days from the promulgation of this ordinance.

" Adopted by the Council of the city of New Orleans, January 14, 1896.

" DAN A. ROSE, *Clerk of Council.*

" Approved, January 14, 1896.

" JOHN FITZPATRICK, *Mayor.*

" A true copy.

" CLARK STEEN, *Secretary to the Mayor.*"

And the following are the objections which are stated in the plaintiffs' petition, and the grounds of nullity upon which they claim to rely, viz.:

## I.

" There is and was vested in the said city government no lawful authority to grant away from or dispose of any property, right or thing of value to the inhabitants of the city of New Orleans or the people of the State ' to any person, persons, association or corporation, public or private,' this being expressly prohibited by Art. 56 of the Constitution of the State and is *ultra vires.*

## II.

" The supposed ordinance on its face unlawfully grants to the said Illinois Central Railroad Company and the said Yazoo & Mississippi Valley Railroad Company special and exclusive rights, privileges, immunity and monopoly in the said described public batture, between General Taylor and Toledano streets, to the exclusion of the public, in violation of the State Constitution, particularly Art. 45, and the provisions of said Constitution prohibiting monopolies.

## III.

" The batture between General Taylor and .Toledano streets, between the public levee and the river, is public property as *locus publicus,* under the laws of the State and Civil Code thereof, to the use ' of which all of the inhabitants of the city, and even strangers, are entitled in common,' and the City Council is without authority or power to destroy or change such public servitude, or repeal and cancel such public grant and consignment to general public use made by the State, and deliver over to private corporations the dominion and control thereof for their own private ends and purposes, as attempted in said supposed ordinance.

## IV.

" Under the public law and jurisprudence of the State no person or corporation can acquire any right to construct or maintain any permanent building or structure on said batture, or make any use thereof tending to impair or impede the right of the public to free access to said banks and batture as a *locus publicus,* or the free public use thereof for all of the purposes for which such public right and servitude on river banks and battures was established by law. Yet, said supposed ordinance, on its face, not only destroys said public right and servitude for the period of ninety-nine years by excluding

the public therefrom without the permission of the supposed grantees, but allows its destruction as a *locus publicus* by the erection of such permanent private 'wharves, docks, piers, bulkheads, elevators, warehouses, sheds and appurtenances' as the supposed grantees may elect at their unrestricted pleasure, which, when erected, are to be private property, under their private control, with even no reservation of the right of entry by the public, either to the said structures when erected, as to the territory, in terms granted away by the said supposed ordinance.

## V.

" It is beyond the legislative or granting authority of the government of the city of New Orleans to grant or convey away the right of the public in any *locus publicus* to any persons or corporations, either permanently or for any time or term of years.

## VI.

" The Legislature of the State never intended to or did ever confer on the government of the city of New Orleans power or authority to make or adopt said ordinance, either in the charter of the city or any amendment thereof, or under any implication of power necessary or legitimate to carry out any power actually conferred on said city for its government. Sec. 8 of the City Charter, approved June 23, 1882, as modified by Act No. 135 of the acts of 1888, only conferring on the city power to either construct wharves and improve the banks, landings, and increase the utility thereof for public commerce itself, or lease the same for a limited period ' to such persons as will bind themselves, with security, to construct and keep in good repair such wharves and landings, and construct and keep in repair sheds over the wharves, and light the same and pay the cost of policing the same, for such just and reasonable charges on vessels and merchandise, or either, for the use of the wharves or sheds, as may be fixed in advance by the Council, and with such specifications as may be required by them.' The limit of leased terms being ten years, and for strictly public use.

## VII.

" If the city had power to destroy and cut off the right of the public in said *locus publicus* by any form of legislation, the supposed

·ordinance is void, because it purports, and on its face grants a term of occupancy of said batture and landings for a period of more than ten years, and without the free competition and adjudication by the Comptroller, after the advertisement and competition made imperative by Act 135 of the acts of 1888, and excludes public general commerce from the use of said *locus publicus*, either for entry, passage or mooring, or unloading of the vessels, without the consent of the supposed grantees named in the supposed ordinance is first obtained, to the exclusion of all authority of the city, the harbor master or any authorities of the port, thereby attempting in said supposed ordinance to convert public rights, public ways and public servitudes into strictly private property and title for ninety-nine years, excluding the general public not only from said territory and public place, but from the benefit and use of all the permanent structures, railways and wharves that the grantees may construct or project into the river at their will.

### VIII.

" That under the laws and settled jurisprudence of this State said supposed ordinance is null and void, because it is unreasonable and oppressive, and contrary to right and public policy."

To this petition the defendants tendered, amongst other things, an exception of no cause of action; and this exception having been sustained, and their suit dismissed, the plaintiffs have appealed.

The province of this court is to determine whether or not the averments of the petition, coupled with the terms and conditions of the ordinance, which for the purposes of the exception are to be considered as read into the petition, have stated a cause of action. As the record discloses that the judge *a quo* did not deal with the question of the right or interest of the plaintiffs to institute this suit, we shall assume that to be true, and restrict our views to the want of corporate power in the City Council to pass the ordinance.

The provisions of the statute of the State which granted a charter to the city of New Orleans, upon this subject, are as follows, viz.:

" Sec. 8.   *   *   *   (5) To prescribe and collect wharfage and levee dues and to erect sheds over the wharves and buildings, to protect merchandise and make such charges therefor as will pay for the construction, keeping in repair, lighting and policing of such sheds and no more.

"The Council may lease or farm out the wharves and landings in sections for a period *not exceeding ten years*, to such persons as will bind themselves with security to construct and keep in good repairs such wharves and landings, and construct and keep in repair sheds over the wharves, and light the same, and pay for the cost of policing the same, for such just and reasonable charges on vessels and merchandise, or either, for the use of the wharves and sheds, as may *be fixed in advance* by the Council, and with such specifications as may be required by them." Act 20 of 1882.

But that act was amended in 1888 as follows, viz:

"Act 135, Acts 1888: Sec. 3. *Be it further enacted, etc.*, That said Council shall have no power to make or renew any lease of the wharves and landings, or any lease or sale of city property, except after public advertisement and free competition, and adjudication by the Comptroller to the lowest or highest bidder, as the case may be, according as the specifications of said lease or sale may require."

This is all the authority the city possesses in the premises—" to erect sheds over the wharves and buildings to protect merchandise," and to "farm out the wharves and landings * * * to such persons as will bind themselves * * * to construct and keep in good repairs such wharves and landings; and construct and keep in repair sheds over the wharves "—not to exceed a term of ten years.

The City Attorney in his brief takes the position that the railroad company has the right "to construct wharves, or other artificial accommodations for commerce in front of its property, and can use the same until the city of New Orleans exercises her exclusive right of building wharves," etc. Brief, p. 1.

Citing: Ellerman vs. Morgan Railroad Co., 34 An. 698; Ellerman vs. McMains, 30 An. 190; City of New Orleans vs. Wilmot, 31 An. 65; City of New Orleans vs. Railroad Co., 27 An. 414; Ellerman vs. Railroad, 105 U. S. 166.

Further, that the city has the power to designate a particular portion of the landings for the use of a particular public carrier, and to allow the use of batture for the erection of sheds and other structures necessary for the shipment or temporary storage of merchandise.

Citing: Heirs of Leonard vs. Baton Rouge, 39 An. 284; City of New Orleans vs. Railroad, 27 An. 415; Stevens vs. Walker, 15 An. 577.

From the foregoing he makes the following deductions, viz.:

"The ordinance in question, in so far as it purports to grant to the Illinois Central Railroad Company the right to occupy for its uses and purposes, for the period of ninety-nine years, from January 15, 1896, all that part of the batture between Toledano and General Taylor streets, fronting the property of said railroad, is not valid, *as a contract*, the city being without power to grant to any person, for any purpose, the right to use any particular portion of the river front *for a term of years;* but the ordinance is valid as *a license*, which the city has a legal right at any time to *revoke*, and which must stand until revoked by the city."

No doubt could be entertained of the legality of the ordinance, if it extended no further nor granted anything more than the argument of the City Attorney assumes; but he fails altogether to treat the real gist of the ordinance, which, in our opinion, is, the gratuitous permission by the city to the defendants to erect upon the batture in front of their riparian property *permanent structures*, such as warehouses, elevators and the like, and to maintain the same for their exclusive uses for a period of ninety-nine years, in connection with and in addition to the aforesaid wharves. His argument altogether ignores the provision of the act of 1888, which declares in positive and mandatory terms, "that the (City) Council shall have *no power to make* or renew any lease of *the wharves* and landings, *or any lease or sale of city property except after public advertisement and free competition,*" etc.

The *license* spoken of is nothing more nor less than the lease or farming out of the wharves and landings, which is mentioned in the city charter above quoted, for there is no other license known to the charter of the city. This is recognized to be the case in the dissenting opinion, from which we quote the following, viz.:

"The power the city now has of passing an ordinance authorizing the *lease* of the wharves for ten years covers a similar power we think as to the term of the lease. The city having the right to let for a term of ten years, has the power to *issue a license* at least for that length of time."

Then follows this distinct statement, viz.:

"The limitation of time as to the grant would not be cause to oust the license if the municipality persists in granting the right of occupancy and of use. As to the effect upon the license of granting

an additional period of occupancy and use, which may be *ultra vires*, we have found no authority directly bearing on the point," etc. But the opinion cites approvingly the three following causes, viz.: City vs. Telephone Company, 40 An. 41; Railroad vs. City, 46 An. 526; Dartmouth College Case, 4 Wheaton, 518.

In our view, that opinion treats the subject as though the city had the right accorded her by the charter to *lease or license the right of occupancy and use of the batture*, whereas the statute confers the power on the city to " lease or farm out the *wharves* and landings," and " construct and keep in repair the sheds over the *wharves*," alone.

It is elementary that " the *use* of the banks of navigable streams or rivers is *public*." R. C. C. 455. That the banks of the Mississippi river is a *locus publicus* in which the entire public have equal rights, irrespective of the ownership of the adjacent property, or the rights of the riparian proprietor of the soil. R. C. C. 509.

The Code declares:

" Servitudes imposed for the public or common utility relate to the space which is to be left for the public use by the adjacent proprietors, on the shores of navigable rivers, and for the making and repairing of levees, roads and other public or common works." *Id*. 665.

It further declares that " works which have been formerly built on public places, or in the beds of rivers or navigable streams, or on their banks, and which *obstruct, or embarrass the use of these places, rivers, streams, or their banks, may be destroyed at the expense of those who claim them*, at the instance of the corporation of the place, or any individual of full age residing in the place where they are situated." *Id*. 861. (Our italics.)

Giving to these provisions of the Code a just and reasonable interpretation, we think the conclusion is irresistible, that the ordinance in question runs counter to the law in attempting to give the defendants a right to erect permanent structures upon the batture which will *obstruct* and *embarrass* the free use of a public servitude, and to maintain the same in perpetuity.

This court has had frequent occasion to construe and enforce the foregoing provisions of law, and among numerous cases the following may be cited, viz.:

In Mayor vs. Magnon, 4 O. S. 2, the case was that of the defend-

ant having erected a shed on the bank of the Mississippi river, between the levee and the river, in order to carry on some work for the Spanish government, and as a place for the deposit of timber, who had enclosed a great part of the bank of the river near it for a shipyard; and Judge Martin, in delivering the opinion of the court, said:

"It appears to this court that the spot which the defendant enclosed is really a part of the common or public land, which is *out of commerce*, incapable of being alienated, and must ever remain free to the inhabitants and strangers; that the defendant can have no right, claim or title thereto, except in common with the rest of the community."

The city authorities ordered these structures to be abated, as a nuisance, and the defendant enjoined them from so doing. The District Court dissolved the injunction, and this court affirmed the judgment.

In Trustees of Natchitoches vs. Cox, 3 N. S. 140, this court affirmed a judgment decreeing the removal of a house which had been erected on the bank of Red river within the limits of the city, on the ground that same was a nuisance, having been placed directly on the "bank of a navigable river, and that it interrupted that use of it which is common to all men. *Partida* 3, 28, 7; *Curia Phillippica, lib.* 3, Cap. No. 16."

In Henderson vs. Mayor, 3 La. 563, the court affirmed a judgment directing the removal of wharves, sheds and steam saw-mills which had been erected by the front proprietors on the alluvion of the river in such manner as to "obstruct a free passage on its bank," on the ground that same constituted a public nuisance; and in the course of their opinion "in relation to the third point, in which it is asserted that the works constructed by the plaintiffs are not incumbrances on public or city property," the court said: "This may be true with regard to the ownership. But if the public or the inhabitants of the city have a right to the use of the places incumbered and the works thereon erected impede and interrupt this public use they may be considered as nuisances. The right of way reserved in the grants of land fronting on the Mississippi, which authorizes the proper authorities to lay out and cause public roads to be made on the banks of the river, does not destroy the right of alluvion vested by law in the riparian proprietors. Yet while such roads remain

appropriated to public use no person, not even the proprietor of the adjacent soil * * * would be permitted to erect buildings or make any works thereon, having a tendency to impede passengers, or in any manner interrupt the public use of the road. Such works would constitute a nuisance, and might lawfully be abated or destroyed by orders from the police authority of the place where they existed, or perhaps by any private individual."

The case of Shepherd vs. The Third Municipality, 6 R. 349, was that in relation to certain valuable saw-mills, and the court said:

"The street and the banks of the river are *loci publici*—out of commerce—and the municipal authorities are bound to see that the use of them by the public be not obstructed; but they *have no power to allow any erection thereon which may render their use incommodious. They may, indeed, temporarily tolerate works thereon, which they may deem not injurious to the rights of the public; but no permission of the council can prevent a subsequent council from* putting an end to such toleration." (Our italics.)

In Harrison vs. City Council of Lafayette, 18 La. 295, the plaintiff enjoined the city, and claimed that the city had no legal right to order the demolition and destruction of their houses, stores and buildings, which the evidence showed had been built of brick on the banks of the river, "*outside* of the front street or highway, and between it and the river," but this court reversed the judgment of the lower court sustaining plaintiff's demand and dissolved the injunction and dismissed the suit.

The case of Herbert vs. Bensen, 2 An. 779, was that of a warehouse which had been erected by the defendant on a portion of the quay in front of the plaintiff's house on Bayou Teche, with the consent of the City Council of the town of St. Martinsville, and which the plaintiff sought to have abated as a nuisance, and the court said:

" It is conceded by the defendant, in his application to the corporation, that the place upon which the warehouse was proposed to be, and was subsequently built, was a public place. It has been so often and so uniformly held by the former Supreme Court that the places within the limits of a corporation can not be appropriated to private use, and that individual corporators, as well as the officers of the corporation, have the right to prevent such appropriation and to sue for the demolition and removal of buildings erected on them by individuals, that the question can no longer be considered an open one. Art. 859

of the Louisiana Code, which provides that corporations of cities, towns and other places may construct on the public places, in the beds of rivers and on their banks all buildings and other works which may be necessary for public utility, for the mooring of vessels and the discharge of their cargoes, *does not authorize the erection of buildings for private emolument.*"    (Our italics.)

Carrollton Railroad Company vs. Winthrop, 5 An. 36, was a similar case.

In McKeen vs. Kurfust, 10 An. 523, it was held that a cotton shed built on the bank of the Mississippi river which prevented the public from depositing their goods upon the same at the usual stage of high water was an obstruction to the use of the banks by the public and removable summarily as a nuisance.

In Sweeny vs. Shakspeare, Mayor, 42 An. 614, the proof showed that the plaintiff had leased from the Texas & Pacific Railroad Company a portion of the batture in front of its riparian property on the Mississippi river, in front of the city of New Orleans, and had thereon established certain piles and clusters of piles, for the purpose of protecting certain hitching posts for the purpose of securing his barges and boats laden with coal, an article which he was engaged in selling to the public; and we held that he was "without right or authority to build houses on the batture, and rest their foundations upon piles driven in the ground. This was an evident appropriation *to his exclusive use of the river bank,* in direct violation of the right of control and administration which is vested in the city."

In Ruch vs. City, 43 An. 275, all of these principles were examined with care and affirmed.

But it is contended by defendant's counsel that a different doctrine was maintained in Watson vs. Turnbull, 34 An. 857, and one that favors the theory for which they contend.

In that case the court employed this language, viz.:

"Within its corporate limits, the city of New Orleans, under her charter and under the general law, has the right to control, manage and administer the use of the river banks for the public convenience and utility; to establish wharves and landings, to erect works, and provide facilities for the use of vessels and water crafts; and to charge just compensation therefor."

But that opinion just as emphatically announces, and we desire to emphasize the statement, that "riparian proprietors have no

right to appropriate to their *exclusive use* these banks, and they have *no private property in the use thereof, which is public.* (Our italics.)

This decision in no manner impeaches the authorities cited, and announces no contrary doctrine, in our conception.

But counsel particularly attract attention to that part of that opinion which reads as follows, viz. :

" The discretion of the city authorities in determining what are proper and needed facilities to commerce, and on what part of the river bank within her limits they should be established, is manifestly not a proper subject for judicial control or interference.

But we do not understand the " facilities to commerce " therein referred to to mean such permanent structures as elevators, warehouses and the like, for the exclusive and gratuitous use and occupancy of a single corporation for a period of ninety-nine years.

The question at issue in Watson vs. Turnbull was whether a riparian proprietor within the limits of the city of New Orleans could restrain the city by injunction from placing hitching posts along the river bank in front of their property, with the view of establishing a landing place, and furnishing facilities for the landing, fastening, etc., of coal boats and other water crafts, and the ground assigned for the injunction was that " there existed no necessity of commerce requiring the placing of these posts; that the plaintiff had already placed, at their own expense, all such posts as were required; * * * and that the said action (of the city) would obstruct the free use of the banks of the river, and cause deterioration in value to the property of complainants."

It is striking, that the question presented and decided in that case was altogether a different one from the one we have at the bar, and that the " facilities to commerce " there treated of are those exclusively relating to the landing and fastenings of coal boats and other water crafts, a matter of administration, pure and simple.

It was quite a similar case to that of Sweeny. vs. Shakspeare, *supra;* and the contention of the plaintiff in that case (Watson vs. Turnbull) was exactly the opposite to that of defendants in this case.

Surely, that opinion is not authority for the proposition that the City Council has power to grant to a railroad company permission to take possession of *all* the batture in front of its riparian property for

the space of a half mile or more within the limits of the city; establish thereon permanent structures and build wharves and landing places for vessels, and *exclusively* use, operate and maintain the same for a period of ninety·nine years, without adjudication, competition or compensation.

The same question again arose in Pickles vs. Dry Dock Company, 38 An. 412, same being an action on the part of a lessee from the city of New Orleans of the Third District ferry across the Mississippi river, to compel the defendant to remove certain illegal obstructions it had placed upon the river bank interfering with the exercise of his franchise.

The contention of the defendant was, that it had " the right to locate their docks and drive piles in the bed of the river because it was a riparian proprietor of the soil in front of the dock, and that it had thus located its dock and driven the piles in pursuance of an ordinance of the police jury of the parish of Orleans," and in disposing of that contention the court said:

"Numerous decisions of this court, in perfect harmony with general jurisprudence on similar questions, have placed beyond the domain of possible discussion the doctrine, that a city vested with the powers enumerated in the charter of the city of New Orleans has the undoubted and necessary power to *regulate the use of the banks* of a water course on which it borders," etc., citing Watson vs. Turnbull, thus placing upon that case the interpretation that the question dealt with and determined was the power to *regulate the use of the banks of the Mississippi river* and nothing more.

And as if to emphasize that statement, the court said further:

" It is now well settled that the general right of the city (to regulate the use of the banks of any water course) *must be modified by municipal regulations when adopted in conformity with chartered authorities.*"

In Heirs of Leonard vs. Baton Rouge, 39 An. 275, plaintiffs sought, as owners of riparian property, to recover from the defendant a strip of batture in front of the city, under the provisions of Revised Statutes, Sec. 318, as not being needed for the public use; and the city defended partly upon the ground "that in the exercise of her corporate powers, and to provide a revenue, lessen the burden of taxation and to increase the facilities of trade in the article of fuel, which is one of prime necessity, she permitted a landing for

FORTY-NINTH ANNUAL REPORTS, 1897.        545

Construction and Improvement Co. et als. vs. Railroad Co. et als.

·coal in front of Leonardtown, where boats and barges are moored; and that for the privilege she has charged an annual rent."

Upon an examination of the evidence we found that the coal-·chute spoken of rested on trestles, and was used for the purpose of. transferring coal from barges on the Mississippi river to the cars on ·the bank.

In the course of our opinion, we said:

" The defendant has not built, nor permitted to be constructed, upon the space in controversy any *permanent* structure. The city ·claims that she only permitted and allowed certain constructions and ·embankments to be made from the bed or sloping bank of the river, between high and low water mark, in the interest of the commercial ·prosperity of the town, and to meet the *actual wishes of the people.*"

And, in the opinion on rehearing, the court said further, that the ·land in question was " necessary for public purposes, and is used for purposes of a public character through the medium of private parties, who act under the city authority *only temporarily granted.* The uses are as a landing, wharf and storing place for coal for the purpose of facilitating the reception and distribution of fuel to the ¡nhabitants at reasonable prices, which are regulated to a certain extent in the ordinance."

" The public character of such uses is not destroyed by the fact that they are temporarily farmed out to particular individuals. ·Cities exercise, without question, the right of designating particular portions of their wharves and landings for the use of certain lines of vessels, or for the reception of certain kinds of commodities; and the power here exercised is of that general character "—that is to say, the power of administration.

The principles announced in that decision are in strict accord with those of Watson vs. Turnbull and Pickles vs. Dry Dock, but they are diametrically opposite to the following contention of the defendant's counsel, viz.:

" So far as constructing elevators, buildings, sheds, railroad tracks, etc., on the batture is concerned, the plaintiffs leave out of sight entirely the fact that this ordinance is, upon its face, a mere *license to riparian proprietors to use* a portion of the batture which (they) own; that under the provisions of Art. 318 of the Revised Statutes, adopted in 1853, *any* riparian proprietor within an incorporated city or town, even a private citizen, who owns batture, may

compel the (municipality) by suit to set aside for his private uses so much of the batture as may not be needed for general public purposes."

In our view, counsel has altogether misapprehended the plain intendment and true import of that statute, as will be seen from our opinion in Heirs of Leonard vs. Baton Rouge, just adverted to.

It does not confer upon a riparian proprietor the right to *carve out* a segment of the river front, and appropriate it *exclusively to his own use;* but it, on the contrary, confers on him only the right to require the city to yield up a portion of the soil of a river bank, of a recently formed batture, when there is more than is needed for public use, leaving the possession and dominion of the remainder, which immediately fronts the river, undisturbed.

In our opinion, that is exactly what the terms of the ordinance purports, for those of the first section declare in plain and unmistakable language, as follows, viz.:

"Permission and authority are hereby granted to the said companies, their successors and assigns, to occupy for *their* uses and purposes for the period of ninety-nine years from the date hereof, *al$^l$ that part of the batture* lying between Toledano and General Taylor streets, fronting the property owned by either of said companies,' etc. (Our italics.)

The grant is further supplemented by those of the second section, which provide that the defendants as grantees are "authorized to construct, maintain and operate upon (said batture) such wharves, docks, piers, bulkheads, elevators, warehouses, sheds, buildings and appurtenances as *the necessities of their business may require*," etc.; that is to say, such permanent and enduring structures as may be required to effectuate the aforesaid right of permanent use and occupancy of said batture.

And still further to supplement the aforesaid grant, it is provided by Sec. 4 "that all steamships, vessels and other water craft, receiving or discharging cargo at said wharves *for either of said railroad companies*, or any steamboat, ship, vessel or other water craft using said wharves *by and with the consent of said companies shall be exempt from the payment of all wharf dues*," etc., thus discriminating against all steamboats, ships, vessels or other water craft *not* receiving, or discharging cargoes for either of said corporations, or with their consent; and giving to said corporations the exclusive use of such

wharves, docks, piers, bulkheads, elevators, etc., as they shall establish on said batture.

And to point and fortify the foregoing terms of the aforesaid grant, the concluding portion of said section declares that same shall not have the effect of "exempting steamships, vessels and other water-craft from wharf dues for receiving and discharging cargoes at or occupying any *other* wharf"—the purport of that clause being that any vessel, of any description, trading or dealing with the defendants, or with their consent, at said wharves and landing shall be exempt from the payment of wharf dues to the city or to the defendants, and that all other vessels of any and every kind and description, doing business at *other* wharves and landings of the city should not be exempt therefrom.

It does not require argument to prove that this ordinance yields up to the two defendants for a period of ninty-nine years, not only the *exclusive use and occupancy of all batture in front of their properties* on the Mississippi river between Toledano and General Taylor streets, but also the *exclusive control* of the wharves, docks, piers' bulkheads, elevators and appurtenances thereon for a like period of ninety-nine years.

Manifestly, if this ordinance be maintained there would remain to the city no right of supervision or use of either batture of this particular segment of the city or the wharves or their enjoyment. Her control over them in the interest of or for the benefit of the public would be entirely lost for a period of ninety-nine years—that is to say, in perpetuity.

The question propounded by this suit is whether the city can lawfully thus give away the use of all the batture and the control of the wharves and surrender the right to collect wharf dues of all vessels dealing at the wharves and landings of the defendants, while collecting from those doing business at all other wharves and landings.

If this ordinance is beyond the power of judicial revocation and annulment, the defendants will no doubt, during the limited period of ten years, have erected upon the batture spacious, expensive and permanent buildings and structures, such as elevators, warehouses, docks, piers, etc., and will have established thereon connections between them and their wharves and landings. They will have constructed railroad tracks along the whole length thereof, crossing all intervening streets, and accompanied with sidings, switches and

turn-outs, such as are usual, convenient and necessary for terminal facilities of two great transcontinental systems, which the defendants represent.

There is, in our conception, no authority for the proposition, either in the ordinance or the law.

The Civil Code provides that "the corporations of cities and towns and other places may construct on the public places, in the beds of rivers and on their banks, all buildings and other works *which may be necessary for public utility*, for the mooring of vessels and the discharge of their cargoes, within the extent of their limits" (Art. 863); but this provision of law does not authorize the city to build permanent structures on the batture or banks of navigable rivers for the exclusive enjoyment and use of private individuals or corporations, or to grant them permission to do so.

But there are some authorities which have been cited and relied upon as supporting the theory contended for by the defendants, and which should not pass unnoticed.

One of those cases is Ellerman vs. Morgan's Railroad and Steamship Company, 34 An. 698; but that decision, in our view, presents an altogether different question.

The plaintiff, Ellerman, like the Construction and Improvement Company in this suit, was the farmer or lessee of the public wharves of the city and sought to compel the defendant to pay wharfage; and the latter resisted, upon the ground, amongst others, that " the right to build and use wharves, was conceded to them and to their vendees by the *State* of Louisiana, and that the concession was a consideration or inducement for the building of the railroad, and constitutes a contract, the obligation of which can not be impaired." And the opinion shows that under a city ordinance then existing, the right of the wharf lessee to collect wharf charges was restricted to the wharves and piers which were "furnished by the city;" and that, as the wharves in question had been built by the defendant nothing was due the plaintiff. Citing Cannon vs. New Orleans, 20 Wallace, 577; New Orleans vs. Wilmot, 31 An. 55.

But aside from that proposition, the railroad company based its exemption from the control of the city on a contract made with the State as a sovereign, in whom the police power is vested, primarily. The city was without power to make such a contract.

And in Cannon vs. New Orleans the court said:

Construction and Improvement Co. et als. vs. Railroad Co. et als.

" It is a doctrine too well settled, and a practice too common, and· too essential to the interests of commerce and navigation to admit of· a doubt, that for the use of such structures"—the wharves—"erected· by individual enterprise, and recognized everywhere as private property, a reasonable compensation can be exacted. And it may be safely added, also, that it is within the power of the *State* to regulate· this compensation, so as to prevent extortion, a power often very properly delegated to the local municipality."

The principle announced in that case is very well illustrated in Railroad Company vs. Ellerman, 105 U. S. 166, which reviews the opinion of our predecessors in New Orleans vs. New Orleans, Mobile & Chattanooga Railroad Company, 27 An. 414, involving the same subject matter as the Ellerman case. *Vide supra.*

That decision may be fairly summarized as follows:

The railroad company having secured the passage of an act of the Legislature in 1869, granting it the right "to enclose and occupy for its purposes and uses" a portion of the batture on the river in front of the city of New Orleans, erected upon same wharves for the use of vessels and maintained same at its own expense.

Claiming as lessee of the city under a contract of 1875, the plaintiff enjoined the railroad company from the further use of the batture, levee and wharves as proposed, alleging that it had their· *exclusive administration.*

In stating the claim of the wharf lessee, and what the decision of the court in 27 An. 414 was, the Supreme Court said:

" What that decision did affirm, however, was that the disposal of the public right on the premises, as a wharf, was in the *State*, to the exclusion of the city, so that if the joint resolution (of the Legislature) had been a cession to a natural person as riparian proprietor, to improve the premises as a landing place for water craft and for loading and unloading cargoes by building levees and wharves at his own expense, with the right to charge reasonable wharfage for their use, it would have been conclusive upon the city and those claiming in its right. And construing the grant to the company as limiting the use of the property as a wharf to purposes strictly incident to its corporate business, still, in order that it should be beneficial to that extent, it would be essential that the company should have the right to exclude all other uses, and this would effectually withdraw it from the jurisdiction of the city authority over the general subject of the public wharves.

" Neither would this be in derogation of any vested right of the city. Whatever the power the municipal body rightfully enjoys over the subject is derived from the Legislature. They are merely administrative and may be revoked at any time, not touching, of course, any property of the city actually required in the course of administration."

The judgment of the court rejected the demand of Ellerman, and maintained the *exclusive* right of the railroad company to use the wharves and landings, which it had constructed upon batture in front of its riparian property; but the opinion is rested entirely upon *a grant by the Legislature* to the company, prior in date to that of the lease of the plaintiff from the city—holding that this legislative grant effectually withdrew the use of the wharves and the right of the city to administer them " from the jurisdiction of the city over the general subject of the public wharves."

The opinion further affirms that " whatever power the city enjoys over the subject is derived from the State, and that they are purely administrative and revocable at the will of the City Council."

But the court was guarded in making that statement, and coupled therewith the declaration that the revocation of any administrative function which the municipal authorities had granted to a private individual or corporation, such as the use of the wharves, " would, of course, not touch any *property* of the city actually acquired in the course of administration."

And, by analogy, the city would, in case of revocation of a grant, be under equal obligation to save the property of the grantee.

Applying the principles announced in that case to the one at bar, it is evident that this court can not affirm the legality of the ordinance under consideration, as it is founded upon neither a legislative grant nor legislative authority; and because the city has, under its charter, only a power of administration of the batture for the public.

But it must be observed that the Legislature did not grant to the railroad company, in the case cited, any such right or privilege as this ordinance proposes without the sanction of legislative authority.

Attention has been attracted to the opinion of this court in City vs. Telephone and Telegraph Company, 40 An. 41; but we do not think it is applicable.

It involves no question of servitude upon a riparian estate or batture, or wharfage; but the permission of the city, granted " to the defendant to construct and maintain telephone lines on its streets."

But the city ordinance was authorized by a special enabling act of the Legislature.   Act No. 124 of 1880.

The provisions of that act were not only consulted by the court in the preparation of their opinion, but they were incorporated in it.

Also, to the case of Stephens vs. Walker, 15 An. 577.

The wharf and warehouse under consideration in that case were erected upon the banks of the Bayou Teche, in front of a public square, with the sanction of the council of the town of Franklin; but these constructions were authorized by a special act of the Legislature of 1857; and the plaintiff found it a necessity of his case to urge the unconstitutionality of the statute.

Of that question the court said:

"If the effect of the legislation was to defeat the rights of the public by a transfer of the public property to the exclusive use and control of private individuals, the position assumed by the plaintiff would not be without force.

"But the statute is susceptible of a different construction, and does not, in our opinion, confer such unlimited powers upon the municipal authorities. The erection of the wharves and buildings, instead of being detrimental, must necessarily be subservient to commerce; *otherwise the privilege is abused,* and the courts will grant the public adequate remedy."   (Our italics.)

Likewise to the opinion of the Supreme Court in the Trustees of Dartmouth College vs. Woodward, 4 Wheaton, 518.

In that case it was ascertained and held that the British crown had granted a charter to the college in 1769, prior to the establishment of the government of the United States, which the revolution did not dissolve, and that the subsequent statute of the State of New Hampshire altering same without the consent of the corporation was an attempted impairment of a contract which was protected by the United States Constitution.

And finally, to the decison in New Orleans vs. Louisiana Construction Company, 140 U. S. 654.   In that suit was involved the question whether the city had so changed the character and destination of a portion of the batture in front of four of its public squares as to render same liable to seizure under execution—the contention on the part of the plaintiffs in that case being that the city had made a *locus publicus* private property through the instrumentality of an ordinance which provided for the shelter and protection of the sugar and

molasses received at the port of New Orleans, the terms of which granted defendants the exclusive right to this use for the term of twenty-five years.

The court held that the grant did not have that effect.

But the ordinance provided that the contemplated sheds should not approach within one hundred and fifty feet of the wharves in front of the sugar landing; and it specifically provided that, at the end of twenty-five years, the city was to have the option of terminating the lease and taking the sheds at half their appraised value, of extending the same for a further period of fifteen years, at the end of which they were to revert to the city.

Upon a careful study of these cases we have been unable to discover in them anything contrary to the opinions of this court we have collated above.

But the contention of plaintiff's counsel goes further. It directs our attention to certain provisions of the Constitution, which he argues, and with force and plausibility, render it very doubtful whether the Legislature *could*, constitutionally, exercise the authorito of enacting a law enabling the city to pass and promulgate such an ordinance as the one under review.

Among the number we may cite the following, viz.:

"The General Assembly shall have no power. to grant, or to authorize any parish or muncipal authority to grant any extra compensation, fee or allowance to a public officer, agent, servant or contractor; nor pay, nor authorize the payment of, any claim against the State, or any parish or municipality of the State, under any agreement or contract made without express authority of law; and all such unauthorized agreements or contracts shall be null and void." Const., Art. 45.

"The General Assembly shall not pass any local or special law on the following subjects, viz.:

   *      *      *      *      *      *      *      *

"Granting to any corporation, association or any individual any special or exclusive right, privilege or immunity." *Id.* 46.

"The General Assembly shall have no power to release or extinguish, or to authorize the releasing or extinguishing, in whole or in part, the indebtedness, liability or obligation of any corporation or individual to the State, or to any parish or municipal corporation therein." *Id.* 57.

" The exercise of the police power shall never be abridged, nor so construed as to permit corporations to conduct their business in such manner as to infringe the equal rights of individuals, or the general well being of the State." *Id.* 235.

" And, finally, the Constitution provides that no monopoly or exclusive privilege shall *exist* in this State," etc.  *Id.* 248.  (Our italics.)

A mere casual glance at the foregoing constitutional provisions suggest a manifest incompatibility between them and a legislative act of the purport of city ordinance 11,765.

In any light in which that ordinance can be viewed, in our opinion , it seems to be utterly illegal and *ultra vires,* and can found no right in, and secure no privilege to, the defendants.

Entertaining this view, we are of the opinion that plaintiffs' petition states a cause of action, and that the judgment appealed from should be reversed, and the cause be remanded for a trial upon its merits.

It is therefore ordered and decreed that the judgment appealed from be annulled and reversed; and it is further ordered and decreed that the cause be remanded to the lower court to be therein proceeded with according to law and the views herein expressed.

And it is finally ordered and decreed that the costs of appeal be taxed against the defendants and appellees, and those of the lower court await final judgment thereon.

NICHOLLS, C. J.    I concur in the decree.

### CONCURRING OPINION,

MILLER, J.   This case is here only on an exception of no cause of action.   It is a suit by citizens and taxpayers assailing, as an illegal encroachment of the public right, an ordinance of the council disposing of the batture.   If, in any respect, the case discloses a cause of action the case must go back.   Our courts have recognized the right of action of the citizen in controversies of this nature, but, if we are to deal with the important questions discussed at the bar, it will be far better to have an appeal on the merits.

The ordinance proposed to grant to the railroad company all the batture between General Taylor and Constantinople streets, in front of the property owned by the companies, of which frontage we have no knowledge, for the period of ninety-nine years, to build wharves,

buildings, warehouses and appurtenances for the uses of the companies.

A long line of decisions has affirmed that the municipal authorities have, in respect to that space defined as between the front row of houses or property line, or Front street to the river, only the administrative function, and no power of alienation. In the charter, the measure of all power the city can exert, it is difficult to find the authority for this ordinance, dealing with this batture.

It is said the ordinance proposed no alienation. If by this is meant that the ninety-nine-year feature distinguishes it from a conveyance, it seems to me the difference is one of phraseology. That public uses are defined in the Code needs no discussion. The ordinance gives all the rights of occupancy and enjoyment for the uses of these companies that ownership can convey.

Our law makes liberal provision for the withdrawal, on the demand of the riparian owner, of such part of the batture on his front as may have become unnecessary for the public use. If the city itself is the front proprietor, it can exact the same right of withdrawal conferred on all riparian owners. This provision, it seems to me, would afford the companies the method entirely within the law of utilizing the front property and batture the ordinance states they own. Whenever batture is withdrawn enough must be left for public use. This ordinance takes all, and practically for all time. Whether accretion in the future expands this batture, or the encroachment of the river diminishes the area, the ninety-nine-year ordinance is to stand an impediment, I think, to that control of public places, apt to become requisite, conferred on the council for the public good, and with which, I think, the city can not part.

A few years since we witnessed the sale under execution as private property, of part of the public levee on which the city had authorized the erection of sheds to shelter products landed on the levee. The Supreme Court of the United States annulled the sale, announcing in its opinion that which is not at all novel to us here, that the council clothed only with the power of administration had no power of alienation of the public levee, nor had it by that ordinance undertaken to do so. The principle of that decision is pertinent in this discussion.

With the limitations given full force, on the power of the council with respect to batture, the line of my investigation has left no doubt

on my mind of the competency of the council to give to railroads or other corporations connected with our commerce, privileges to build and maintain wharves, elevators, docks or other constructions on the batture or extending into the river, of a character to serve the uses of commerce. Such privileges have been of constant recognition. It is not within the province of our opinion only on the exception to say more as to such privileges, their scope or as to the supervision they imply of the city authorities. I have endeavored to say briefly what the discussion here seems to invite, and thus indicate my view in general propositions as to this ordinance.

I concur in the decree which simply remands the case for trial on the merits.

### Dissenting Opinion.

BREAUX, J. The Louisiana Construction and Improvement Company, one of the appellants, claims to have a *locus standi* in court for the reason (it alleged) that it has complied with its contract as farmer of the revenues of the public wharves; that performance on its part involved the necessity of making large improvements and annually expending large amounts; that one of the covenants of the contract required the wharfage should not be charged at any of the wharves and landings improved for or by the city, and that, in consequence, the grant herein involved is illegal. In addition to this special ground the appellant company and three other taxpayers represented that the city of New Orleans unlawfully attempted to grant to the Illinois Central Railroad Company and to the Yazoo & Mississippi Valley Railroad Company for the period of ninety-nine years the public batture on the banks of the Mississippi river, between Toledano and General Taylor streets, fronting property owned by the defendant companies between these streets.

The preamble of the ordinance assailed, sets forth the purpose to extend the commerce of the port and facilitate the business of the defendants, and to that end the body of the ordinance grants permission and authority to the defendant railroad companies, to occupy for their use and purposes, the batture, for the period alleged by the plaintiffs; they (the defendants, common carriers) are also authorized to construct thereon wharves, docks, piers, bulkheads, elevators, warehouses, sheds, buildings and appurtenances at their expense, and they are required to conform, as nearly as possible, to a stated

standard in the construction of the wharves; the other improvements, by the terms of the ordinance, include steam locomotives and other motive power. These are to be located upon the wharves and along the wharves on the river front between the streets before-named, with the further right of crossing intervening streets and of connecting the tracks, switches and turnouts with the track of the New Orleans Pacific Railroad Company on Water street and with the wharves, docks, elevators and buildings that the defendant company may construct upon the batture and upon their property; they are also authorized to operate a single track, with necessary switches, sidings and turnouts from certain points designated in the ordinance.

The ordinance exempts steamships and other water craft receiving or discharging cargo at these wharves for either of the defendant companies, or with their consent, from the payment of wharfage dues. In other words, in the language of Sec. 4 of the ordinance, all water craft "receiving or discharging cargo at said wharves for either of said railroad companies, or any steamships, vessels or other water craft using said wharves by and with the consent of said railroad companies, shall be exempt from payment of all wharf dues; but this shall not exempt steamships, vessels or other water craft from wharf dues for receiving or discharging cargo at or occupying any other wharf."

The defendants pleaded several grounds of exception and the exception of no cause of action in the alternative, which was sustained by the District Court.

I pass without comment, as it would serve no purpose in support of my conclusion, all the grounds pleaded, save those included in the plea of no cause of action.

### THE SPECIAL INJURY AVERRED BY ONE OF THE PLAINTIFFS.

First, it is insisted that the Louisiana Construction and Improvement Company, in its individual capacity, is exposed to personal injury, which, it alleged, it sought to avert by intervening in this suit and by joining the other plaintiffs who are resident citizen taxpayers of the city of New Orleans.

This intervening company is lessee of the public wharves and landings of the city from Toledano to Piety streets (a distance on the river front not included in the license to the defendant railroad companies) for the term of ten years from the date of the lease.

It alleges substantially that the wharf charges agreed upon between it and the city embraced a rate of charges for all wharves; those to be charged by it and those to be charged by the city, outside of the limits of the territory included in the lease.

It also alleged that it agreed to these conditions, and subsequently expended large amounts in the construction of wharves and other improvements of the public landings, thinking (it averred) that the wharfage dues (if charged) would reimburse it for the large expenditures made.

It urged that the city has violated its contract by gratuitously allowing to the defendants a portion of the public landings above the territorial limits of its own grant.

It appears to me that the right granted to the Louisiana Construction and Improvement Company was confined by the words of the act granting the right to the shores designated in the lease, but, conceding for the moment that the letter of the act is as extensive as it is claimed by this company, the interpretation is impossible that would entitle the farmer of the revenues to control the rate of wharfage of wharves not within the territorial limits covered by the lease.

The city was without the power to make such an agreement. Railroad vs. Ellerman, 105 U. S. 166-174.

But I have conceded more than the act of lease grants to the Louisiana Construction and Improvement Company. After a careful reading of the many sections of the act, I am convinced that it was not the intention of the city to transfer to this company the right to control the rate of charges at other wharves than those expressly leased. There is no express stipulation in the contract of lease regarding the city front not leased; without such a stipulation it would be difficult to conclude that the unleased portion was subjected to the same charges for wharfage without regard to the will of the municipality. In my view, the lessees did not acquire the right to control the rate of charges on the river front not leased to them.

### THE CITY HAS NOT ALIENATED A PUBLIC RIGHT.

The next proposition relied upon by the appellant is, that the city of New Orleans was without power to destroy or change a public servitude and deliver a portion of the shores to the dominion and control of private corporations.

In view of the facts I do not think this proposition can be sustained.

The city has granted a license to a corporation to use a portion of the banks of the river. It does not hold from the city a right at all, translative of property. The dominion is not illegally affected by the ordinance assailed. The property remains the property of the riparian owners subordinate to the servitudes imposed for public utility.

### WITHIN CONSTITUTIONAL LIMITATIONS.

Another objection urged by the plaintiff against the ordinance assailed is, that it was contrary to Arts. 45 and 56 of the Constitution prohibiting the public authorities to "loan, pledge or grant" any property of the State or city to any person or corporation, public or private.

The word "grant," as employed in the article of the Constitution, does not include a mere "permit" or "license." They are public works.

In lieu of wharfage dues the city elected to accept additional facilities to commerce on the line indicated.

I do not think that the license has anything about it of the gratuitous, and that is "the grant" which the Constitution prohibits; the purpose was the improvement of the port and additional facilities to public commerce.

### POWERS DELEGATED TO THE CITY.

Another objection of the plaintiff is, as I interpret, that no authority was given to the city, in any case, and for any purpose, to grant a license as here granted, and that it was never intended to grant or to let any public battures, or river bank for any purpose for a period longer than ten years, nor to authorize any one to impair or destroy the right of government of the general public.

May it not be said in answer to plaintiffs' last clause of the objection, that the city has not impaired the rights vested in third persons, or destroyed any common right, by authorizing repairs at a designated point on expressed conditions. The ordinance has only modified the use. The improvements permitted are public.

Reverting to the alleged want of delegated power in the Council urged in the first division of the objections I am considering, it must be taken for granted that no one will assert that the city

Construction and Improvement Co. et als. vs. Railroad Co. et als.

did not have control and management of the wharves, landings and quays.

Under this grant of power the corporation may adopt such means as are required in the interest of proper control and good management. Was it not within the power granted of legitimate control and management?

In Schwartz vs. Flatboats, 14 An. 240, 244, I find an affirmative answer. The farming of markets, port dues, and other similar acts, said the court, are acts of administration. The public is the great usufructuary; the corporation is the administrator, and as such has the power to "license" and "permit" the use as was proposed by the ordinance assailed.

In addition to the delegated power of administration, there are special powers delegated.

The council may farm out the wharves. Why should not this power cover or include the secondary right of granting a license?

*Quod minimum sequendum est.*

Again: the city unquestionably had the power to refuse to riparian owners the right to erect wharves.

Upon this point it has been decided that a power to refuse to riparian owners the right to construct wharves included the additional power to grant the right. City of Baltimore vs. White, 2 Gill. 459.

It has even been treated or considered as one of the implied powers of a corporation.

" In the earliest times of the colony before the passage of any ordinance upon the subject wharves were built by the proprietors of land bounding on the sea by permission of authority of the towns." Gray's Reports, Vol. 3, p. 514.

Lastly on this point: "The corporation had the exclusive right to determine when and to what extent the riparian proprietors might take possession of the batture." Remy vs. Municipality, 12 An. 500.

### LIMIT OF LICENSE AND WANT OF ADVERTISEMENT.

Other grounds relied upon by plaintiffs are that the limit of the license, ninety years, and the failure to advertise the grant for sale and invite competitive bidders, affected the grant with nullity.

The riparian ownership of the shores of waters is of great antiquity

and from the earliest period in the history of civil law that ownership has carried with it rights and privileges not enjoyed by third persons.

In the Institutes of Justinian it is announced with oracular brevity:

*Præterea quod per aluvionum agro flumen adjecit jure gentium nobis acquiritur—i. e.*, whatever the river has added to your lands becomes yours.

The principle governs in matter of the banks of the river here, as it applied to the borders of the Tiber under the reign of Augustus.

But the right of the owner is subordinate to a servitude, imposed for public or common utility.   C. C. 665.

In our view, however, the municipal authorities may grant to him a right or privilege on the river banks immediately in front of his lands, that they might properly deny to one who is not the owner of the adjacent lands, provided always so as not to work an injury to the public.

"The right of the General Assembly to grant the right to corporations or individuals to make and maintain wharves has been long settled."   Railroad Co. vs. Ellerman, 105 U. S. 166-174, citing, approvingly, 5 An. 661; 15 *Id.* 577; 22 An. 545; 6 N. Y. 523; 26 *Id.* 287.

In the first cited case, it is true, the State was the grantor of the right to maintain wharves to the riparian owner.

In this case the right of maintaining wharves and of controlling the public battures by legislative grant was in the city.   The city is authorized to maintain wharves and control the batture.

With reference to the term of the license, if it be an issue here, I have already stated, the power the city now has of passing an ordinance authorizing the lease of the wharves covers a similar power as to a license.  The city having the right to let for ten years, has the power to issue a license at least for that length of time.

The result is that the plaintiffs show no cause of action during the ten years from the date of the license.   The cause will arise if at all after that period.

For the purpose of illustrating:  A riparian owner authorized by the municipality to build a wharf, or to construct other improvements beneficial to navigation in front of his property, stipulates that it shall remain under his management, subject of course to municipal supervision, for a stated number of years.

Let us assume that, as to term, the municipality has exceeded its

powers.  A number of taxpayers sue to have the constructed works removed as a nuisance and the occupant ousted.

Those suing, in so far as relates to nuisance, would find no support in Stevens vs. Walker, 15 An. 577, in which "nuisance," in a similar case, was discussed and a principle in connection therewith announced.  The limitation of time as to the grant would not be cause to oust the licensee if the municipality persists in granting the right of occupancy and of use.

But time is not an issue.  We have noticed it only because it was earnestly argued for plaintiffs.  Term is not of the essence or of the nature of a license.  It is an incidental stipulation.  C. C. 1764.

The question regarding the term has been passed upon by this court adversely to the position of plaintiffs in this case.  City vs. Telephone and Telegraph Company, 40 An. 41-47.

The court declared that the grant was perpetual.  This case was approvingly referred to by this court in Railroad vs. City, 46 An. 526 and 529, citing also the leading Dartmouth College case, 4 Wharton, 518.

The first cited decision *supra* and the opinion subsequently affirming it are more than ample to sustain my own position, more limited in its scope and effect.

In conclusion, on this point, it does seem to me that under its powers of administration, and its other " special " powers, to which I before referred, a large commercial city watered by a noble river, near the sea, has the authority to permit the riparian proprietor, for a limited time, to take possession of the batture and wharves for public use.

As relates to the want of advertisement and alleged failure to offer the privilege for sale by auction, the law invoked applies to the leasing or selling of the wharves and landings.

It is different in matter of this license.  The city has not parted with its right to govern and to see that the license is complied with in every particular in the interest of the public.

There is here no lease or alienation of any kind, requiring a sale, under charter provision.

### LIMIT OF POWER.

I do not agree with the statement or share in the apprehension gravely and forcibly expressed at the bar, substantially; if the

ordinance now under consideration is legal, the river front on both shores of the river, within corporate limits of the city, may be disposed of without possible restraint of any kind.

Every ordinance must be reasonable and not inconsistent with the laws and public policy. The reverse of the proposition does not admit of argument. The license granted, we think, was both reasonable and consonant with public policy. It granted a privilege in which each, the city and the licensees, have an interest. The one in advancing the importance of its port; the other in increasing the volume of their business. Any ordinance, unreasonable and not in the public interest, as relates to public servitude, is not beyond the reach of judicial authority; such an ordinance, for instance, as would dispose of " both shores of the river without possible restraint of any kind."

This brings us to the question of an alleged franchise, which will, it is urged, destroy all other wharves or compel their maintenance by direct taxation. The argument at this point in the case is directed against Sec. 4 of the ordinance copied in our opinion. The argument at the bar was chiefly directed against the "consent" feature of the section by which the companies are authorized to permit other vessels than those receiving or discharging cargoes for them, to use their wharves.

This additional authority may have been intended only as a complement of the license, to enable the licensees to more freely exercise the right granted. In any view there is not an actual issue before us for determination. It will be time enough to decide this issue, suggested in argument, when an actual case will be presented. It may never arise.

The objection, even if well taken, is inapplicable to the remaining portions of the sections.

If, in litigation, hereafter, it be decided that the " consent " feature is illegal and void, the other portions of the section would not thereby be affected.

" It is true that a portion of an ordinance may be objectionable and the other portions may be good, and in such cases that which is good remains." State vs. Mahner, 43 An. 496, 500.

The ordinance as a whole was attacked. I have considered it in its entirety. If in the exercise of the right granted, the licensees, in minor details, should attempt to exercise rights, illegally to the

prejudice of other portions of the servitude on the river banks, it will be time enough to pass upon the actual case.

The following may, in a degree, illustrate and serve to suggest additional answer to the many questions raised in opposition to the ordinance.

Let us for a moment consider a new site. Imagine a new city lying on both sides of a navigable stream, guarded and protected on each side by a wall, with gateways at the foot of each street; with steps and inclines leading down to the river; with twenty-five gates on each side of the stream for ingress and egress, in imitation of the capital of the Orient on the Euphrates in the rich valley of that river of old. At all the gates save one dues are charged. At the gate excepted highly valued commodities, in which the public have an interest, are admitted free of all charges.

It would not be in the power of a few of the inhabitants of the city to cause the gate to be closed. To charge at one gate, all the gates being free, would be an illegal discrimination against the public; but to exempt one gate, though dues are collected at all the other gates, is not a discrimination against the public, but in favor of the public.

In the same way and for similar reason, if all the wharves were exempt from dues it would be unlawful discrimination to permit the defendant companies to charge at the wharf of which they have the use; but it is not unlawful, in my view, in a port where charges are generally collected to except a limited front for a purpose deemed useful and public by the municipality.

The following is a summary of the points from my view of the issues:

The defendant common carriers were legally authorized to maintain a free wharf for vessels connected with their business upon condition that improvements were to be made in the interest of commerce and industry. The use is public, and there was no invasion of any legal or equitable right of any one.

The right of the city as regards the borders of the Mississippi river is a right of regulation and management, broader than exists in case an individual is authorized to regulate and manage. It does not cover the right of alienation, but the city has not sold or leased the batture.

The funds, credit, property, or things of value of the State, have not been loaned, pledged or granted by the grant of a license

to riparian owners, to modify the public use of the batture and wharves.

Under its delegated and implied powers the city has the right to pass an ordinance "to extend the powers of the port and to facilitate the export and import business" of corporations in the service of the public.

The license being legal and authorized is not made necessarily void as between plaintiffs and defendants by the period of ninety-nine years for which it was granted. The licenser does not object; on the contrary, insists that it is legal.

As to the necessity, under the law of advertising and inviting bidders, that applies to the alienation or lease of property, not to a license with a grant of use to the riparian owner.

A license to common carriers for public use, at a particular point, would not warrant the issuing of other licenses without regard to reason and the necessities of commerce.

McENERY, J., concurs with Breaux, J.


ON APPLICATION FOR REHEARING.

WATKINS, J.   The District Judge maintained a plea of no cause of action and dismissed the plaintiffs' suit, and they having appealed we reversed his decree—a majority of the justices entertaining the opinion that the petition disclosed a cause of action.

The result of our decision is that the cause will be reinstated and remanded for trial according to law; and in the lower court it will have the same *status* that it had before this appeal was taken— the plea of no cause of action being omitted.

We have decided no issue *in* the case.   Those issues made, as well as those which may be hereafter raised therein, will be considered and determined by the District Judge; as they will be completely at large.   But, while expressing this view, we do not abandon or intend to modify the views which the majority of the justices entertained, originally—*i. e.*, that the plaintiffs' petition discloses a cause of action.

MR. JUSTICE BLANCHARD not having participated in the original opinions and decision of the cause, takes no part in this opinion, and MR. JUSTICE BREAUX adheres to his original views.